Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. Welcome to the second day of oral argument in calendar number 16. These are unusual circumstances. The 11th Circuit Court of Appeals is determined as a court to do our duty and our function as well as we can in these circumstances to decide the cases that have been appealed to us in as fair and efficient and prompt manner as we can. We appreciate the cooperation of the attorneys in this technological approach to doing that. As for special instruction, I have none other than to suggest that if you're arguing multiple issues, it might be good to let us know in advance what those issues are and also to pause at the end of each argument of each issue in case the court has any questions. We will, of course, be asking questions during the course of your argument on that issue. So to accommodate that, if you would speak in a normal conversational style instead of the breakneck pace that some attorneys employ to say as much as possible during an oral argument, we would appreciate that. Having said that, the first case on today's docket is United States v. Benjamin. We'll hear first from the attorney for the appellant, Mr. Reisenstein. Good morning, and may it please the court. My name is Philip Reisenstein. I represent the appellant in this case, Johnny Benjamin. I will be reserving five minutes for rebuttal to the government, and I will be addressing multiple issues before this court. And pursuant to your instructions, I will pause at the end of each issue. The first issue that I wish to address before this court is the issue of the but-for cause of death of the woman who died in this case after the drugs in this case were distributed. And in thinking of this issue, it occurred to me that there is a famous saying among astronomers that absence of proof is not proof of absence. And I believe in this case what the government proved at trial and what they are arguing in appeal is that absence of an explanation for the death of the emcee becomes proof of her death related to the drugs in this case. And that proof did not exist at trial. There was no but-for proof regarding the drugs that were attributed to Johnny Benjamin and her death. What we know is that emcee was tragically addicted to painkillers. Her husband testified that she often bought pills when her prescription ran out. And the government argues without any firm proof that the only pills she could have bought were those pills attributed to Johnny Benjamin. The only pills she used were those pills she got from a Mr. Slater who got them from a Zachary Stewart who got them from Johnny Benjamin. And there are too many assumptions of fact to consider that this was proof beyond a reasonable doubt to trigger the enhancement and the life sentence. The other serious lack of proof in this case was from the medical examiner and the toxicologist. And essentially that proof amounted to the fact that since this was an unknown substance and since it had not been tested, any consumption would automatically cause death. Now what we know from... Counsel, wasn't there evidence from Dr. Benjamin himself that it was 20 times more powerful than fentanyl or than oxycodone alone? Didn't he make that statement? Wasn't there testimony that he had made that statement? I particularly don't recall that statement, but I would not disagree with the court's recollection of that or that this in fact was a powerful substance. But what we do know is that there were .22 nanograms of this found per milliliter in her blood. The record contains the testimony that a nanogram on page 320 is 10 to the minus ninth power of a gram and that there's no way to quantify whether this is a dangerous amount or not. And the facts in the case belie the medical examiner's testimony because the government's facts in the case through text messages were that Mr. Slater and MC had in fact taken these pills and of course had lived. Mr. Slater testified he sold three sets of pills to MC. So to argue that the medical examiner's testimony was sufficient proof beyond a reasonable doubt because she died, there's no other reason to know why she died. Well, look, Court, this is Judge Marcus, Counsel. The medical examiner said more than that she died. The medical examiner testified unequivocally that fernal fentanyl was indeed the cause of the death. Was there not enough evidence to support it if that testimony was credited? There was not enough evidence to support it because if you take it one step further and look at her answer to why she arrived at that conclusion, and an expert's conclusions must be supported by the record, her conclusions are we don't know what's a safe amount, this is dangerous, so therefore any amount is lethal. I'm just curious. I thought that the expert said that the victim's blood tested positive for caffeine, one glass of wine's worth of alcohol, and the fentanyl, and that she had no underlying health issues that might have caused her death. Did I get that right? I agree. Yes, sir. You did, in fact. And I agree with all of that, but here is the next leap that can't amount to proof beyond a reasonable doubt. Because of that and because this substance is unknown as to its lethality, we're just going to assume that this substance, therefore, caused her death. And that's one step too far in proof beyond a reasonable doubt. And I'm looking for... Counsel, this is Judge Carnes again. Benjamin himself warned Stewart in pages 644 and 645 of the trial transcript that these were much more powerful than the other pills and that people should only take half a pill instead of an entire pill. They're stronger than earlier batches. That's 645-46. And then he gave them to Ms. Crowley the day before she took one and died. Did she not? Did he not? I agree that the chain of custody is that she received pills the day before she died. But, of course, the assumption is those are the only pills she received and that those are the pills she took. A jury could infer that the reason she died when she died and that linked to when she got the pills that the defendant himself said and warned were much more potent and stronger is because she got one of the stronger pills, took it, and died. Yes, I agree. Well, I agree it's an inference. I agree that's what the jury did, but I don't believe that there is proof in this record that shows that that's actually the pill she took from Dr. Benjamin and this pill, in fact, was lethal enough to cause her death because all the medical examiner ends up saying is she... There's clear evidence, page 918. She took enough to kill her. It's not the same thing that this drug did kill her. If I may move on, I'm at 2 minutes and 40 seconds left on my 10 minutes. The second issue I would like to address before the court is this somewhat complicated issue of jurisdiction, and I would basically simply say this. We've presented the court information that the DEA criminalized this substance, FUF, on November 29, 2016, and that that is after the time period of the indictment and that the notice that we've provided a site to says that all criminal and civil penalties begin on the final effective date of November 29, 2016, and that is... But there was already... Counsel, wasn't there already a provision in making an analog to a listed substance criminal? In other words, wasn't this analog criminal on its own right, regardless, as an analog, before it was made criminal on its own right? I mean, isn't that the government's theory? It is, and essentially what I would say is that this notice, on its plain language, criminalizes this substance because it says, if you have it before this date, this is how you turn it in. So I understand what the court and the government are saying, that essentially these substances, I'll use the word, blink into existence and criminality when they are created by a chemist at whatever time that is. Then the DEA becomes aware of it. I will note that the Analog Substance Act is inside of the Controlled Substance Act, and this notice of November 29 then criminalizes and places this substance inside the Controlled Substance Act. I would like to move very quickly to the search and seizure issue and argue that this is error plain on the record, that the search was not consensual, that the court's findings that this search of Dr. Benjamin's bag would have occurred because there was probable cause specifically is belied by the testimony on the record that the agent said they did not have probable cause, and I would ask the court in the 15 seconds I have left to consider this. It can't be consensual under Florida v. Bostock, which was a bus case at a bus station. The Supreme Court held that police officers' searches and consent searches can occur. I'm out of time, and so I will stop unless the court has questions. Thank you, counsel. While you're thinking about your file argument on your statement that the agent said he did not have probable cause, of course that's the agent's subjective view. We've held repeatedly it's an objective test for the court, and the fact that an agent thought he didn't have probable cause is no more binding on the court than the agent thinking he does have probable cause. But if you want to address that in your reply time, you can. If you don't, you don't have to do so. Thank you. Next up is Ms. Delzel. Thank you. Good morning, and may it please the court. This is Catherine Delzel on behalf of the United States. As the panel is aware, this is a case in which a medical doctor manufactured illicit drugs that killed someone. Dr. Benjamin's argument on appeal failed for the reasons stated in our brief, but here I will just make a couple of points in response to the discussion today, and of course I'm happy to answer any questions that the court may have. Turning first to the first issue raised today, which is sufficiency of the evidence on causation, as the court noted there was unequivocal expert testimony that furanyl fentanyl caused MC's death. The medical examiner testified specifically, she would have been alive if it wasn't for the furanyl fentanyl. The record fully supports that opinion. The alcohol and tramadol found in her blood, in addition to the furanyl fentanyl, did not contribute to the death, according to both the medical expert and the toxicologist. The alcohol that was in her system was approximately one drink's worth, far under the legal limit, and the tramadol was a trace amount, if that. And again, the medical examiner testified unequivocally that those substances did not contribute to the death. There was no other explanation for the death. There was no Daubert challenge below to the basis for these experts' opinions. They were undisputedly qualified as experts. And it's true that there are no studies specifically on furanyl fentanyl, but it's not as though the medical community knows nothing about it and has no basis for concluding how lethal it is. Medical professionals know it's toxic, as the experts testified clearly here. The medical examiner testified it is more potent than fentanyl. The toxicologist testified that it is estimated to be 20 times more potent than morphine. You can die from simply touching the substance, the medical examiner testified. So again, it's a fentanyl analog, and the medical community certainly knows a lot about how toxic fentanyl is. So the suggestion that there's no basis for making these conclusions about fentanyl's toxicity and the role it played in the death here are unsupported. And the reason there are no studies is because the drug has no legitimate purpose and it is so dangerous that the medical examiner testified that you can't ethically do studies on this drug. So there was plenty of evidence to support causation in that regard. There was also more than enough evidence to show that the furanyl fentanyl came from Benjamin. Construing the facts in a light most favorable to the government, as this court is required to do, shows that Benjamin purchased M30 mold dyes for a tablet pill press. And again, M30 was the marking on the pills that eventually made their way to MC. In the storage unit that Benjamin leased, the pill press wheel and other items were contaminated with furanyl fentanyl residue. The testimony showed a clear chain of distribution from Benjamin to Stuart, from Stuart to Slater, and then from Slater to MC in August of 2016. The testimony showed a final sale of 20 pills to MC on the day she died, and those came from Slater. Fourteen pills were found in her bedroom with the same M30 markings, and those pills tested as furanyl fentanyl, as containing furanyl fentanyl, which again was found on the manufacturing equipment in Benjamin's unit. Furanyl fentanyl was detected in MC's blood, and the substance was specifically furanyl fentanyl, not just any fentanyl analog. And again, that's connected to the chemical that was found in Benjamin's belongings. Stuart and Slater immediately suspected Benjamin's pills, and Benjamin expressed no surprise over the death. Again, in this case, Benjamin also testified, and he made several incredible claims, including that he had never seen oxycodone, he was unfamiliar with it, and this was despite that police found a stockpile of it in his safe at home. He testified that he never manufactured pills, despite an abundance of pill manufacturing equipment being found in his storage unit. He denied that the voice on the audio recordings was his. The jury can consider all of this as well as substantive evidence of guilt, in addition to the clear chain of causation, or chain of distribution from Benjamin to the victim who ultimately died here. Turning next to the question of subject matter jurisdiction, this court had subject matter jurisdiction. All that is required, or I mean the district court did, all that is required is that the indictment allege an offense against the laws of the United States. Here, the indictment did that. This is not a case where the indictment alleged conduct that even if true, does not constitute a crime. So there was subject matter jurisdiction here. The question of whether furanyl fentanyl is an analog is just a non-jurisdictional challenge to the sufficiency of the evidence, and Dr. Benjamin stipulated to that fact at trial. Dr. Benjamin is also incorrect that furanyl fentanyl was not an analog before it was scheduled. The fact that it was later scheduled does not mean that it was never an analog, as the panel pointed out. Of course, the whole point of the Analog Act is to catch substances that are on their way to being scheduled, and of course the fact that this substance, furanyl fentanyl, was ultimately scheduled corroborates its danger and then met the criteria for an analog. Additionally, it's clear that Benjamin had noticed that this was an analog. He was evasive, he concealed his actions, he obviously knew it was illicit, and whatever the DEA said in its order for scheduling furanyl fentanyl has no bearing on what Benjamin would have understood before that order came into existence. Turning next to the suppression issue with the airport search, the district court did not clearly err in concluding that Benjamin voluntarily consented to the search. This circuit's case law is clear in both Lopez-Page's and the Herzberg case that airline passengers consent to a luggage search by entering the screening area. Again, Lopez-Page's held this clearly. It stated that, alternatively, we hold that a sign at the airport security checkpoint informing all persons entering the area that they will be subject to search provided the necessary consent for the searches of Lopez-Page's and his luggage. Counsel, sorry, this is Robert Luck. We don't really need to get there, right, because the trial court specifically found that the defendant consented to the airport police's search in his bag, regardless of whether there's consent by just walking into the security area, right? Correct, correct. I think there's consent on both grounds. You know, he both consented by entering the screening area, and I think that there was not a clear error in concluding that he consented to the search itself of his bag. Right. As I understand the record, please correct me if I'm wrong, the way this worked is he put his stuff through the conveyor belt. Afterwards, an airport police officer approached him, brought him over, said, can I search your bag, and he said, yes, you can. And then they brought him to the other room, and that's when the officer mentioned the bullets. Isn't that what happened? Correct, correct. And the district court held that the consent was voluntary at both of those steps. So I agree that, you know, there's no clear error. The district court made both of those holdings. So I completely agree the record supports consent here. Even if there wasn't, you know, again, we had several alternative arguments in our brief, but I don't think the court needs to reach that. I would just say too that in the briefing below, an issue was made with respect to the distinction between an administrative search for safety versus a contraband search, but fentanyl is a very dangerous substance here, and so I think the idea that there was no safety reason to do this search is just incorrect. Again, the testimony from the medical examiner is clear that people can die just by touching this substance. So Agent Buemi from the DEA also testified, I was never going to let this fentanyl, or obviously it was counterfeit fentanyl that they knew he had, but of course they also knew he had a history of carrying fentanyl on airplanes. So, you know, Agent Buemi said there's no way we were going to let him get on the plane with this. It's very dangerous. And I believe that is all I would address today based on the discussion in the opening argument here. Unless the court has further questions, we would rely on our brief. We don't. Thank you, counsel. Mr. Rosenstein, five minutes. Thank you. I have five minutes. I will respond to the last question the court asked me. Regarding essentially the inevitable discovery and rely on a case from this district in 2015, United States v. Johnson, written by Judge Pryor, that says the government must establish the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads in their possession, but they can't establish that because even though it's an objective standard, the agent testified they had asked for permission to get a warrant and they were denied it by a supervisor, so they weren't going to go that route, even if objectively they could have. With regard to Judge Luck's questions regarding consent and the questions of the panel, the lower court, the district court here, failed to distinguish between the difference of a contraband check and a security check. There's case law that has said there is a difference between presenting yourself at the airport to have your back screened for weapons and a subsequent, more intrusive check for contraband, which involves the Fourth Amendment. Counsel, sorry, this is Robert Luck. Even if I agreed with you on that legal point, didn't the trial court go find that there was actual voluntary consent, separate and apart from the consent of entering a secure checkpoint area? That's correct, and that's where I say that the record actually refutes that and the trial court erred. To find that there's consent, and I think what I wrote in my brief was that unless you are a learned scholar of the Fourth Amendment, and I think I cited a case from a judge in the Fourth District Court of Appeals in Florida that said he, as a lawyer, was never aware that he had a right to refuse a request of a police officer for a consent search. So here's the scenario we have. We have an airport... Let's assume that's right for the moment. Isn't there evidence in the record that your client actually did in the past refuse a consent search of his own? Didn't they bring an officer from, I think it was Michigan, down to testify to that fact? Yes. This is different. A home is different than an airport. And when you're walking through an airport and you go right through the security screening for the weapons, and someone approaches you and says they want to continue the screening... Now, we need to remember, this was a set-up. They could have stopped Mr. Benjamin anywhere between the airport and his home as he was driving to the airport, but they knew he was going to the airport. Also, I take issue with what counsel for the government said... Well, counsel, the record, as I understand it, doesn't say that... He said, can I continue the search? As I understand it, the officer approached Benjamin after the luggage went through and asked, is this your luggage, and can I search it? And Benjamin said, yes, sir, and even offered to open the back door. Is that right? I agree. I was advocating in the sense of saying this clearly was a continuation of it, but I do agree that he didn't say the words, may I continue the search. But my argument to you is that this was clearly, by anyone making... You know, under the factors of whether this was voluntary or not, they were asking to continue a search that just occurred. Bullets were bandied about as a reason for this at a point when he was removed from the area and taken to another room. I agree. And the point I would like this court to address is that this isn't a bus station, and this is after September 11, 2001. This is at an airport, and the... I guess the term or the word I'm looking for is that the coercion here is significant. You are entering an area where being checked for weapons. You're being asked by a uniformed police officer to search more intrusively, but we know this isn't for weapons. We know this is for contraband, and the Fourth Amendment comes into play in this matter. So it's different from a home. And we also know that... Counsel, is it your position that you can't consent to a search at an airport? I mean, the guy asked, and you're saying that's not enough. There was a coercive atmosphere. He's in an airport. There's less voluntariness than if he was somewhere else. So you would have us hold that you can't consent to a search in an airport? No, sir. I would have you hold that under these circumstances where you were not told that you have the right to refuse a consent, and all parties agree, and that is a significant part of a consent search. I thought the Supreme Court in Snackoff v. Bustamante said there's no requirement on voluntariness that you warn someone they have the right not to consent. It's a factor, and it's only a factor. There's no hard-line rule. Each case is a factor, and we think that this is a significant factor based on an airport, not a bus station, at this time period with the rules of society being what they are in airports. I'm out of time. I'm not asking the court to ask a bright-line rule. I'm asking the court to make a decision. Thank you for your time. Let me take one second and compliment the court on its courtroom deputy and personnel who have made this, I think, for all counsel much easier than we anticipated. Thank you very much. Thank you, counsel. We appreciate that. We'll take that case under submission.